ACCEPTED
15-24-00132-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 4:28 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15–24–00132–CV**

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 4:28:30 PM
CHRISTOPHER A. PRINE
Clerk

AIRW 2017-7, L.P. ET AL.,

*Appellants,*

*v.*

CITY OF GEORGETOWN, TEXAS,

*Appellee.*

## REPLY BRIEF OF APPELLANTS AIRW 2017-7, L.P.; 600 WESTINGHOUSE INVESTMENTS, LLC; 800 WESTINGHOUSE INVESTMENTS, LLC

Andrew B. Davis
Texas Bar No. 24082898
andrew@lkcfirm.com
William T. Thompson
Texas Bar No. 24088531
will@lkcfirm.com
Todd Disher
Texas Bar No. 24081854
todd@lkcfirm.com

LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
T: (512) 693–8350
F: (512) 727–4755

*Counsel for Appellants AIRW 2017-7, L.P.; 600 Westinghouse Investments, LLC; 800 Westinghouse Investments, LLC*

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................... ii

INDEX OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

    I.   AIRW's permit is consistent with regionalization. ............................ 2

        A.  The permit is consistent with regionalization because
            the City denied wastewater service. ............................................... 3

        B.  The City's argument that the Commission could not
            consider the costs of annexation has no basis in law. ................. 13

        C.  The City's other complaints about how the Commission
            implements regionalization are baseless. ..................................... 17

    II.  The City's half-hearted attempts to poke holes in the permit
       fail. ........................................................................................................ 19

        A.  The City failed to present any evidence that the permit
            does not protect water quality. ...................................................... 19

        B.  The City's antidegradation arguments lack any
            evidentiary support. ....................................................................... 20

        C.  The City's nuisance-odor arguments ignore the
            undisputed evidence. ..................................................................... 21

        D.  The City provides no evidence that the permit fails to
            protect human health. .................................................................... 23

        E.  The application was substantially complete and
            accurate. .......................................................................................... 24

PRAYER ............................................................................................................. 25

CERTIFICATE OF SERVICE .............................................................................. 27

CERTIFICATE OF COMPLIANCE ..................................................................... 27

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Save Our Springs All., Inc. v. Tex. Comm'n on Env't Quality,*
713 S.W.3d 308 (Tex. 2025) .................................................................20

**Statutes and Codes**

Georgetown Unified Dev. Code § 13.05 .............................................6

Tex. Gov't Code § 2003.047 ...........................................................18, 19

Tex. Loc. Gov't Code § 212.172 ............................................................12

Tex. Water Code § 26.003 ........................................................3, 15, 17

Tex. Water Code § 26.081. ......................................................................17

Tex. Water Code § 26.0282 ...........................................12, 15, 16, 17

Tex. Water Code § 26.030 ......................................................................22

30 Tex. Admin. Code § 305.43 ............................................................25

30 Tex. Admin. Code § 309.13 ............................................................22

## INTRODUCTION

The City of Georgetown concedes that "regionalization policy was not drafted to be leveraged by permit applicants or those in opposition thereof." Resp. 22. But leveraging regionalization is exactly what the City wants to do. The City invokes regionalization to prohibit AIRW from obtaining its own wastewater permit and to coerce AIRW into agreeing to annexation. Fortunately, that is not how regionalization works. The Legislature gave the Commission—not individual cities—discretion to decide how to implement regionalization. And the Commission reasonably concluded that granting AIRW a wastewater permit is consistent with regionalization.

The heart of the City's argument is that the Commission should have forced AIRW to seek a waiver of the annexation requirement from the city council before concluding that the City denied service. But the Commission rightly rejected this approach. No law or regulation requires an applicant to explore every possible political path to obtain wastewater service before the Commission can make a regionalization determination. And the City does not even pretend otherwise. The Commission correctly understood that when a city enacts a mandatory ordinance requiring annexation, city staff repeatedly confirm that annexation is required, and the city staff explicitly reject alternatives to annexation as "non-starters," developers need not pursue futile political remedies.

The City also argues that the Commission could not rely on the costs of annexation—roughly $20 million in this case—to conclude that forcing

1

connection to the City would be unreasonable. But the City concedes that the Commission may consider "denial of service, costs, and other relevant factors when following the regionalization policy." Resp. 10. $20 million in lost value because of the increased tax burden from annexation is not only a real cost to AIRW because taxes must be paid, but also a "relevant factor" among other legitimate cost factors that the Commission could consider when analyzing regionalization.

Finally, the City half-heartedly argues that the Commission erred in granting the permit for reasons unrelated to regionalization. These arguments are all meritless, which is why even the trial court declined to reverse the permit for the reasons the City now recycles.

In short, the Commission reasonably exercised the discretion the Legislature entrusted to it. It considered the evidence, weighed the City's annexation demands against regionalization's goals, and reasonably concluded that forcing connection under these circumstances would be unreasonable. The trial court's decision to substitute its judgment for the Commission's determination was error. This Court should reverse and render judgment.

## ARGUMENT

### I. AIRW's permit is consistent with regionalization.

The City's arguments that AIRW's permit is inconsistent with regionalization rest on a fundamental misunderstanding of both

regionalization's purpose and the Commission's broad discretion to implement regionalization through "reasonable methods." Tex. Water Code § 26.003. The Commission exercised its discretion to grant AIRW's permit application rather than require it to connect to the City's wastewater facility because it found that the City demanded costly annexation as a condition of service. The City disagrees with this conclusion, but all its attempts to undermine it fail because substantial evidence supports the Commission's findings, and those findings reflect a reasonable exercise of the Commission's undisputed discretion.

## A. The permit is consistent with regionalization because the City denied wastewater service.

The Commission granted the permit because it concluded that the City effectively denied AIRW connection to its wastewater system by conditioning service on annexation. 1.AR.66 at 10 (FOF 42). The City does not dispute that requiring annexation as a condition of service is an effective denial or that an effective denial of service is a reason to grant a permit consistent with regionalization. Indeed, the City concedes that "the Commission has the discretionary authority to approve or deny a permit based on regional availability," Resp. 14, and acknowledges that "availability" for purposes of regionalization is a practical inquiry into real-world accessibility, *see* Resp. 14-15. The City instead raises scattered arguments that the Commission's factual finding on annexation is

3

unreasonable and not supported by substantial evidence because the city council never formally denied service. This argument fails.

### 1. The Commission did not need to wait for a formal city council determination on annexation.

The City's primary argument assumes a procedural requirement found nowhere in Texas law. According to the City, the Commission cannot conclude that a city denied service unless a developer has both formally requested waiver of the annexation requirement and received a formal rejection of that waiver request from the city council. Resp. 18 ("Without so much as an attempt to formally introduce a Development Agreement to the City Council, it is impossible to know whether the City Council would or would not be willing to waive the annexation requirement."). But the City cites no statute imposing this requirement. Nor does it point to any case, regulation, or guidance mandating that applicants take the political steps that the City demands. That is because there is no such requirement.

The Commission's permit application document specifies what applicants must do to demonstrate regionalization efforts—they must identify nearby facilities and request service. 2.AR.98 at 1-2. The Application instructs applicants to coordinate with nearby providers and document those efforts. 2.AR.146 at 33.[1] But nothing requires pursuing political

---

[1] The City briefly argues that this Court should affirm because AIRW did not "provide[] certified copies of the correspondence it sent to the City" in its application. Resp. 9. But the City cites no law or rule requiring communications to be in this format, and never explains why this matters when the authenticity of the correspondence is undisputed.

processes to obtain a formal denial from the city council. And nothing demands that applicants seek waivers when cities impose conditions on service. If the Commission intended to require applicants to explore every possible political solution, it would have said so in its guidance. The absence of any such requirement confirms that the Commission retains discretion to determine when efforts to obtain service have gone far enough.

The Commission properly exercised that discretion here. It found as a matter of fact that "[t]here was no indication that the City was willing to waive the annexation" requirement. 1.AR.66 at 10 (FOF 41). This finding rests on substantial evidence: the City's mandatory ordinance requiring annexation, repeated staff confirmations of this requirement, explicit rejection of alternatives as "non-starter[s]," and the statement that there was "no need to revisit" the issue. 2.AR.101 at 1; 2.AR.131 at 12-13. The City cites no example where it has ever granted such a waiver to any developer. And when AIRW specifically proposed pursuing a development agreement for service without annexation, the City rejected that proposal, stating that "nothing . . . should have been construed as the City entertaining providing wastewater service to this project in the ETJ." 2.AR.101 at 1.

The City's insistence that a permit cannot be granted until the city council formally acts would, if adopted by this Court, require the Commission to treat mandatory municipal ordinances as merely suggestive on the speculation that a city council might someday waive that ordinance. Under this theory, a city could enact any requirement as a condition of

wastewater service—for example, it could require a developer to pay $100 million, dedicate all property to the city, or convert the property to industrial use—yet developers could not rely on these requirements to seek a wastewater permit until formally requesting and being denied a waiver of the requirement. This cannot be the law. When a city enacts mandatory legislation stating properties "*shall . . .* submit a petition for voluntary annexation," Georgetown Unified Dev. Code § 13.05 (emphasis added), that legislation represents the city council's official position. The Commission acts reasonably in taking mandatory ordinances at face value.

## 2. The Commission properly relied on city staff communications as evidence of the City's position.

The City fundamentally mischaracterizes both the Commission's reasoning and AIRW's argument with respect to communications with city staff. Neither the Commission nor AIRW claimed that city staff statements legally bind a city council in the sense that the city council cannot diverge from city staff. *Contra* Resp. 22. That is a strawman of the City's own making. The relevant question is not whether staff can create binding legal obligations or always predict the city council's position, but whether their communications amount to substantial evidence supporting the Commission's finding that service was effectively denied.

As AIRW explained in its opening brief, it is reasonable to infer the city council's position from multiple authorized staff communications, particularly when the staff explicitly state they are conveying "the City's

6

position." AIRW 31. The Assistant City Manager did not offer his personal opinion—he stated that "the City's position remains the same; annexation will be required." 2.AR.101 at 1. The Planning Director confirmed that "annexation will be required." 2.AR.107 at 3. When senior city officials repeatedly state a city's position over many months, reasonable developers need to be able to rely on those statements in making business decisions, including the decision to apply for a wastewater permit.

The City's assertion that "it does not matter whether the staff was acting aligned or contrary to the wishes of the City Council" (Resp. 22) is telling. In one sense, this statement is true: it does not matter because the Commission could reasonably conclude that service was effectively denied even *if* there was a chance the city council would eventually waive annexation after a drawn-out political process. After all, effective denial can come simply from the delay of having to go seek and obtain a waiver from a mandatory ordinance. But more importantly, this statement highlights that the City has never disavowed staff statements that annexation is required. As detailed in AIRW's opening brief, there was significant public attention to this project. AIRW 23-24. Yet the city council never suggested flexibility on annexation. Indeed, to this day, the City still has not said that the city council supports service without annexation—because the City does not support it.

The Commission reasonably concluded that when city staff are this clear and consistent, developers need not pursue lengthy and expensive

7

political processes. The City's contrary position would paralyze development. Under the City's theory, no staff communication short of formal council action would have meaning. Every interaction with planning departments would be provisional. Developers would need city council resolutions before relying on any city position. Although formal council action certainly binds cities in ways staff statements do not, the Commission properly recognized that in the practical world of property development, businesses must be able to rely on clear, repeated statements from senior city officials about city requirements.

### 3. The record conclusively refutes the City's assertion that negotiations remained open.

The City now contends that negotiations for service without annexation remained ongoing, characterizing its communications as a "qualified approval, [rather] than an outright rejection." Resp. 16. According to the City, "[t]he door was not entirely closed" because the City's planning director, Sofia Nelson, said "please let me know if you would like to discuss further." Resp. 17. From this single phrase in a single email, the City attempts to construct a narrative of ongoing negotiations.

The actual record tells a very different story. Ms. Nelson stated in that message that the City does "not support a delayed annexation approach." 2.AR.107 at 3. Indeed, she specifically rejected AIRW's proposal on annexation and made clear that "annexation will be required." *Id.* So read in context, her concluding line telling AIRW to let her know "if you would like

8

to discuss further" is hardly an invitation to continue negotiating about annexation. *Id.* This is confirmed by later communications expressly telling AIRW it can either "annex" to connect to the City's wastewater system or "develop in the ETJ with a private water treatment facility." 2.AR.103.

The City also argues that AIRW could have pursued waiver of the annexation requirement through a development agreement. Resp. 23. This is a bit rich, considering that AIRW specifically tried to do this and was shut down. In May 2020, AIRW wrote: "we would like for the City to agree to work with us on . . . a Development Agreement that would result in the City providing sewer service. The agreement could not require annexation or limit land use but other options would be on the table and it would be site plan specific." 2.AR.101 at 2. AIRW even offered "substantial financial contribution by the Developer to help the City with road or utility projects." 2.AR.101 at 2. But the City's response could not have been clearer: "[N]othing that was said on our call yesterday should have been construed as the City entertaining providing wastewater service to this project in the ETJ. We have had multiple meetings and communications with [AIRW] on this topic, have explained our position in detail, and there is no need to revisit this request as the City's position remains the same; annexation will be required in order to receive wastewater service from the City." 2.AR.101 at 1.

Moreover, even accepting the City's mischaracterization that its communications were merely informing AIRW "of a generally applicable

9

annexation requirement" (Resp. 18), the Commission's finding must stand. The substantial evidence standard does not require the Commission to adopt the City's view of disputed facts. The Commission found that the City's communications showed no willingness to waive annexation. 1.AR.66 at 10 (FOF 41). Multiple written rejections over many months amply support this finding such that it cannot be overturned on the deferential substantial evidence standard.

### 4. The City's position would create an unworkable system that undermines the Commission's authority.

The City attempts to minimize its annexation requirement by characterizing it as merely "an additional procedural step in the process of connecting to the City's system—a step that may be waived by the City Council upon request." Resp. 14. This characterization is breathtaking in its audacity. The City calls a requirement that would cost $20 million and force conversion from residential to commercial development a mere "procedural step." But even accepting the City's framing, the Legislature granted the Commission—not the City—the discretion to decide what procedural steps (if any) are required to implement regionalization.

The annexation-waiver process the City demands is anything but simple. As the City's own brief reveals, obtaining a development agreement requires formal application with fees, review by a Development Agreement Committee, technical review and public notice, a Planning and Zoning Commission hearing and recommendation, and finally a city council hearing

and vote. Resp. 23-24. This process could take months or years with no defined timeline, no objective standards, and no guaranteed outcome. The City argues there is "no way of knowing whether the City Council would delay or waive the requirement without going through the political process." Resp. 19. That is precisely the problem—as the Commission rightly recognized, regionalization does not require developers to pursue an indeterminate political process when there is no evidence to suggest that it will end in waiver and thus a feasible connection to an existing wastewater system.

Moreover, the City's position fails to recognize that forcing developers to navigate lengthy political processes is itself a form of denial and renders service unavailable. *See* 2.AR.98. When a city erects procedural barriers that require months or years of lobbying, significant legal and consulting fees, and uncertain outcomes, it has effectively denied service just as surely as if it had said "no" outright. The Commission properly recognized that denial can be accomplished through delay and procedural obstacles, not just explicit rejection. A city cannot escape its decision to effectively deny service by creating a theoretical path to service that requires developers to run a political gauntlet—especially where, as here, that city has given no indication that navigating the process would lead to a different result.

The City provides no limiting principle for its contrary position. Texas law authorizes development agreements to supersede various local requirements. *See* Tex. Loc. Gov't Code § 212.172 (authorizing agreements to

11

modify municipal regulations). Under the City's theory, any requirement that could theoretically be waived through a development agreement must be pursued to formal denial before the Commission can find service unavailable and thus grant a wastewater permit consistent with regionalization. This would include not just annexation but impact fees, design standards, and any other condition a city might impose. Cities could layer endless "procedural steps" between developers and regional service.

This approach would fundamentally undermine the Commission's broad authority to implement regionalization through "reasonable methods." As AIRW explained in its opening brief, the City's position would create a shadow permitting system where state permits depend on indeterminate local political processes. AIRW 27-28. The Legislature gave the Commission—not city councils—discretion to determine when regional service is available. Tex. Water Code § 26.0282. And the Commission is robbed of its discretion if it must wait indefinitely for developers to navigate all municipal political processes.

The practical consequences from the City's position would be catastrophic and anathema to what the Legislature intended when it vested in the *Commission* the discretion to decide when, if ever, to require connection to an existing wastewater system. Under the City's view, cities opposed to development in their extraterritorial jurisdiction could weaponize regionalization by imposing conditions designed to force developers into lengthy political processes. Development would be delayed

12

for years while developers lobby city councils. And cities could extract unrelated concessions by dangling the prospect of waivers. Indeed, that is precisely what the City is trying to do here: use regionalization to pressure annexation of a development that it otherwise lacks the legal authority to control.

## B. The City's argument that the Commission could not consider the costs of annexation has no basis in law.

The City concedes that "the Commission has the discretion to consider denial of service, costs, and other relevant factors when following the regionalization policy." Resp. 10. Yet the City argues the Commission abused its discretion by considering the $20 million cost that annexation would impose on the development. This position contradicts the City's own concession and lacks any basis in law.

The City first attacks the $20 million figure as "speculative" and "hypothetical." Resp. 10, 25, 27. Not so. This figure derives from additional city taxes that annexed properties must pay—and there is nothing speculative about tax obligations. *See* AIRW 23-24. In addition, there is substantial cost to being forced to convert the development from residential to commercial to comply with the City's land use requirements. 2.AR.107 at 1. This is also not speculative: an independent appraisal computed this $20 million difference between the property's unincorporated and incorporated values in part based on land use differences. 2.AR.93 at 2, 16-17. Nor is any of AIRW's evidence disputed. The City does not, and cannot, point to any

evidence that either the $20 million figure is inaccurate or that the City's planned (commercial) zoning for the property would not be financially punitive. More importantly, the City can point to no statute or rule establishing specific cost criteria the Commission must consider.

The City relatedly argues that the $20 million is not a cost because "cost is a real expenditure" rather than reduction in value, and the $20 million reflects an overall loss in property value. Resp. 26. But this loss in value is attributable to city taxes, and tax payments are very much a "real expenditure." Regardless, even if the $20 million were not a "cost," it would still be one of the "other relevant factors" that the City concedes the Commission may consider. 2.AR.98; *see* Resp. 10 (admitting that the Commission may consider "denial of service, costs, and other relevant factors when following the regionalization policy").

The City next argues the Commission could not consider costs to affiliates of AIRW rather than AIRW itself. Resp. 10. This hyper-technical argument ignores practical reality. As AIRW explained in its opening brief, AIRW owns the land for the facility while affiliated entities own the land where residences will be built. AIRW 3-4 & n.1. These entities are all part of one integrated development project. The Commission understood this, as did the City. And the City does not cite a single statutory provision, regulation, or piece of guidance that prohibits the Commission from considering costs to a development project as a whole rather than parsing costs among affiliated entities. The Commission correctly rejected the City's

myopia in favor of holistic analysis as part of its charge to implement regionalization through "reasonable methods." Tex. Water Code § 26.003.

The City also argues that the Commission cannot consider an applicant's property value in the context of regionalization because it does not consider property value when assessing the impact of a permitted activity on nearby landowners. Resp. 11-12. That is nonsense. These are entirely different contexts that have nothing to do with each other. And the City provides no reason why the factors that the Commission considers when addressing public comments from nearby landowners about a permitted use must be the same factors it considers when assessing whether to require a wastewater applicant to connect to an existing wastewater system. The fact is, the Legislature delegated to the Commission the authority to assess regionalization using all "reasonable methods," and nowhere prohibited it from considering the applicant's diminution in property value due to changes in tax obligations resulting from required conditions of service as part of that cost. Tex. Water Code §§ 26.003, 26.0282. It accordingly has discretion to consider property values in this context when analyzing regionalization.

The City also argues that the Commission's decision to consider the costs of annexation when assessing regionalization is inconsistent with the Commission's guidance that "effects on property values" in response to public comments. Resp. 11-12. Not so. *First*, the webpage has nothing to do with regionalization. The webpage addresses what issues the Commission

15

may consider with respect to public comments from third parties, not what the Commission may consider as part of its obligation to determine whether an existing wastewater system is "available" in the real world. Tex. Water Code § 26.0282. *Second*, as explained above, the $20 million figure is driven by increased taxes, not just an effect on property value.

Next, the City's argument that connecting to the City's wastewater system would cost less than building a new wastewater system ignores the costs of annexation. Resp. 26. As AIRW demonstrated, while physical connection costs are similar, annexation imposes an additional $20 million overall burden. AIRW 24 n.5. The City's refusal to acknowledge these costs does not make them disappear. In any event, even if the City were correct that connection costs to the City were lower than the cost of AIRW's stand-alone plant, regionalization does not establish any rules where the lower bid automatically prevails.

Ultimately, the City admits "the statute does not limit the Commission's discretion to consider the cost impacts of the City's annexation requirements and development regulations." Resp. 29. This concession should end the inquiry. The Commission considered costs within its discretion, those costs are supported by substantial evidence, and the City's nitpicking provides no basis for reversal.

## C. The City's other complaints about how the Commission implements regionalization are baseless.

The City's assorted other regionalization arguments likewise fail. The City complains, for instance, that the Commission failed to adequately consider "encouragement and promotion of the use of regional waste collection, treatment and disposal systems." Resp. 11 (citing Tex. Water Code §§ 26.003, 26.0282). But the Commission encourages and promotes use of existing systems by directing applicants to request service from nearby providers and to document those efforts. 2.AR.74 at 77-80. And that is what AIRW did. The statutory requirement that the Commission "encourage[]" connection to existing wastewater systems does not mean it must mandate connection at any cost or in all circumstances. The Water Code directs the Commission only to use "reasonable methods" to implement regionalization. Tex. Water Code § 26.003. And forcing developers to connect in the face of millions of dollars in costs or wholesale changes to their projects—as the City demands here—is not a reasonable way to encourage regional systems.[2]

Relatedly, the City's argument that the Commission violated the requirement to use "all reasonable methods to implement" regionalization reads out the word "reasonable." Resp. 11. The Commission did use reasonable methods—it instructed AIRW to coordinate with the City and seek service, which it did. And when the City demanded unreasonable

---

[2] The City is not a designated regional provider under Tex. Water Code § 26.081 *et seq.*

17

conditions, the Commission reasonably exercised its discretion to grant the permit. The City wishes the Commission had subordinated all other considerations to regionalization and denied the permit, despite the fact that the application did not violate a specifically applicable state or federal requirement. *See* Tex. Gov't Code § 2003.047(i-2)(2). But that is fundamentally unreasonable. Moreover, it is contrary to the grant of discretion to the Commission because it would mandate denial whenever a facility exists within three miles. That is not the law.

The City lastly protests that regionalization "is not an administrative or procedural check-the-box step" but rather ensures "that TCEQ does not rubber-stamp new projects when there is sufficient existing infrastructure." Resp. 21. This argument is misplaced since the Commission did not "rubber-stamp" anything here. The Commission conducted a contested case hearing over three days, heard from eleven witnesses, admitted over 100 exhibits, and made detailed findings of fact after an overall application review process of more than two and half years—all of which followed AIRW's nearly year-long effort to obtain service from the City. 4.AR.181. Based on that voluminous record, the Commission found that although the City has the capacity to provide service, its annexation requirement enshrined in law and repeatedly imposed by city staff made that capacity effectively unavailable to AIRW. This is precisely the type of practical, case-specific analysis that the Water Code contemplates and that the Legislature entrusted to the Commission.

18

## II.    The City's half-hearted attempts to poke holes in the permit fail.

The trial court correctly rejected all the City's attacks on the permit's technical provisions. That court held that the Commission's decision must be reversed "for the following reasons," all of which related to regionalization. CR 730-31. It did not agree with any of the numerous other complaints that the City now recycles on appeal. And the City's failure to convince the trial court on these other issues is unsurprising. The Commission conducted a thorough technical review, made detailed findings supported by substantial evidence, and properly concluded the permit protects water quality and complies with all applicable requirements. The City's attempts to manufacture error where none exists should be rejected.

### A.  The City failed to present any evidence that the permit does not protect water quality.

The City devotes pages of its response brief to reciting water quality law without identifying any actual error in the Commission's analysis. Resp. 30-34. The City bore the burden to rebut AIRW's prima facie showing that the permit meets all legal requirements. Tex. Gov't Code § 2003.047(i-1), (i-2). But it "did not present evidence disputing the accuracy" of the AIRW's water quality evidence. 1.AR.59 at 24 (explaining that the City did not counter AIRW's evidence "of the [Aquatic Life Use], [Dissolved Oxygen] determinations, or effluent limits or how such determinations and limits are not protective of existing uses and wildlife.").

19

To be sure, the City asserts that it "introduce[d] . . . evidence of protecting water quality," but it does not identify or discuss any of this supposed evidence. Resp. 32. This is unsurprising given that the City failed to produce a single witness who is either a water quality expert or familiar with the Texas Surface Water Quality Standards. Without expert testimony on water quality, the City cannot overcome the detailed evidence from the Commission's aquatic scientist Jenna Lueg, water quality modeler James Michalk, and AIRW's 50-year expert Paul Price, all of whom confirmed the permit protects water quality. 2.AR.127 at 3-5; 2.AR.73 at 45; 2.AR.84 at 9.

## B. The City's antidegradation arguments lack any evidentiary support.

The City's arguments that the Commission violated antidegradation principles are all meritless.

*First*, the City claims "the administrative record indicates that the Commission failed to conduct the appropriate inquiry into the uses and criteria for the receiving water." Resp. 34. Not so. A witness for the Commission, Jenna Lueg, testified in detail about her antidegradation review, explaining how she determined uses for each receiving water segment, applied appropriate dissolved oxygen criteria, and performed both Tier 1 and Tier 2 antidegradation analyses. 2.AR.127 at 5-10. This is the same analysis that the Texas Supreme Court recently upheld. *See Save Our Springs All., Inc. v. Tex. Comm'n on Env't Quality*, 713 S.W.3d 308, 321-27 (Tex. 2025). The City introduced no evidence contradicting this testimony.

*Second*, the City faults Lueg for allegedly not considering "the codified narrative standard for the protection of aesthetic values" and for admitting "to not always considering what land uses will be around the receiving water body." Resp. 34-35. But the permit explicitly prohibits discharges that would violate aesthetic standards, including visible oil and grease, foam and froth, and suspended solids. 2.AR.73 at 002. As for surrounding land uses, Lueg properly focused on existing uses that were in place at the time the application was filed rather than speculative future uses. Regardless, when asked about future land use at Patterson Ranch—a nearby, in-progress housing development on a former agricultural property—she testified that the permit already had "limits … that should protect human health." 4.AR.181 at 696.

*Third*, the City complains that "Lueg's supporting documentation is devoid of any mention of narrative standards; criteria protective of livestock watering, irrigation, or terrestrial wildlife." Resp. 35. Yet the City presented no evidence that the permit fails to protect these uses. And the uncontroverted evidence shows the opposite—the permit protects primary contact recreation (including ingestion of water), which necessarily protects less sensitive uses like livestock watering. 2.AR.78 at 23; 2.AR.84 at 13.

## C. The City's nuisance-odor arguments ignore the undisputed evidence.

The City's nuisance-odor arguments also fail. The City claims that realignment of County Road 111 will eliminate the necessary 150-foot buffer

21

between the units producing nuisance odors and the nearest property line. Resp. 36. *See also* 30 TAC § 309.13(e)(1) (discussing 150-foot buffer). But the buffer zone map shows the 150-foot buffer runs from treatment units to the "Facility Boundary"—not to any road. 2.AR.74 at 0070 (buffer zone map). The buffer zone does not include any road and does not rely on the presence of a road to create the required buffer. 2.AR.74 at 0070. Accordingly, even after the road realignment, the Patterson Ranch property line will still be more than 150 feet from any nuisance-odor producing units. *Compare* 2.AR.74 at 0070 (Buffer Zone map) with 2.AR.89 (Site Location and Discharge Route map depicting "existing CR 110 to be abandoned and removed").

The City next argues that the Commission violated Texas Water Code § 26.030(b) by not considering effects on a "park" at Patterson Ranch. Resp. 37. But Section 26.030(b) only applies to discharges "into any body of water that crosses or abuts any park, playground, or schoolyard within one mile of the point of discharge." Tex. Water Code § 26.030(b). Janet Sims testified that there is "[n]o" "evidence of parks, playgrounds, or schools on the Patterson Ranch currently." 4.AR.180 at 417. And speculation about future and unspecified "greenspace" that will still "not [be] a public park" cannot trigger statutory requirements. 4.AR.180 at 418.

## D. The City provides no evidence that the permit fails to protect human health.

The City argues that the permit does not protect human health because the Commission allegedly failed to consider "context-specific health and safety implications of the discharge." Resp. 3, 38. But the City's entire argument reduces to speculation about what might happen if there are "treatment failures or power outages" at some undefined future time. Resp. 3. The City wants "redundant units and storage facilities," Resp. 3, but its own witness conceded these are not required by rule. 4.AR.179 at 8-16. Indeed, two witnesses provided unrebutted testimony that such features were neither required by rule nor warranted by special site characteristics. 2.AR.124 at 12:10-18; 2.AR.87 at 8:9-11, 20-22.

Moreover, the permit already contains extensive operational requirements to protect human health. It requires operator certification and disinfection to meet "criteria established in the [Texas Surface Water Quality Standards] for the protection of human health and for primary contact recreational uses." 2.AR.78 at 21:15-18. The highly treated effluent is not harmful to humans, even if ingested during recreational activities. 2.AR.78 at 21:4-22; *see also* 2.AR.84 at 11:1-11. That is why Lueg testified that the draft permit already has "limits . . . that should protect human health." 4.AR.181 at 696.

The City lastly complains that the permit relies on "generic permit language" and "rote assumptions" rather than site-specific analysis. Resp. 3,

23

38. This is an amorphous criticism—and not one that the City argued below. Regardless, it is meritless, as every TPDES permit includes some general provisions standard for every permittee.

## E. The application was substantially complete and accurate.

The City's final refuge is to attack the application's completeness, despite its failure to identify any legally required information that was omitted from the application. Resp. 39-40. The Commission found that "[t]he Application included all required information and was substantially complete and accurate." 1.AR.66 at 12 (FOF 62, 64). This finding is supported by testimony from multiple witnesses, including Gordon Cooper, who explained that the application "went through both an administrative and a technical review [that] provided [Executive Director] staff an opportunity to determine whether the administrative and technical portions of the application were missing any information." 2.AR.124 at 10-11.

The City complains that 600 Westinghouse and Jonah Water should have been listed as co-applicants. But AIRW owns the site where the facility will be located, making it the proper applicant. 1.AR.66 at 6 (FOF 6). The 600 Westinghouse entity is not an owner of the facility—AIRW owns the facility site after 600 Westinghouse conveyed it the necessary acreage. 2.AR.167 at 2-3. As for Jonah Water, it has no current responsibility for the facility—its future operation is contingent on permit transfer in a separate proceeding. 2.AR.113 at 2-3. Moreover, it is within the Commission's staff's discretion

24

under 30 Tex. Admin. Code § 305.43(a) to require co-permittees based on case-specific circumstances, and they chose not to require multiple applicants in this case.

The City's remaining complaints about missing maps, population estimates, and certified letters are makeweight. The application provided all information that the Commission needed and requested to evaluate the permit application, including information identifying nearby facilities and documentation of coordination efforts to satisfy regionalization. 2.AR.78 at 13:4-20. The Executive Director had the opportunity to request additional information through the notice of deficiency process but reasonably determined the application was complete. 2.AR.78 at 6:19-21.

## PRAYER

The Court should reverse the judgment below and render judgment for the Commission, AIRW, and the other intervening defendants.

25

Dated: September 19, 2025

Respectfully submitted.

/s/ *Andrew B. Davis*

| | |
|---|---|
| Helen S. Gilbert | Andrew B. Davis |
| Texas Bar No. 00786263 | Texas Bar No. 24082898 |
| hgilbert@bartonbensonjones.com | andrew@lkcfirm.com |
| BARTON BENSON JONES, PLLC | William T. Thompson |
| 7000 N. MoPac Expwy, Suite 200 | Texas Bar No. 24088531 |
| Austin, TX 78731 | will@lkcfirm.com |
| | Todd Disher |
| Edmond McCarthy | Texas Bar No. 24081854 |
| Texas Bar No. 13367200 | todd@lkcfirm.com |
| Ed@ermlawfirm.com | LEHOTSKY KELLER COHN LLP |
| MCCARTHY & MCCARTHY, LLP | 408 W. 11th Street, 5th Floor |
| 1122 Colorado St., Suite 2399 | Austin, TX 78701 |
| Austin, TX 78701 | |

*Counsel for Intervenor-Defendants AIRW 2017-7, L.P., 600 Westinghouse Investments, LLC, and 800 Westinghouse Investments, LLC*

26

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2025, I electronically filed the foregoing with the Clerk of the Court using the eFileTexas.gov electronic filing system, which will send notification of such filing to the email addresses denoted on Service Contacts List.

/s/ *Andrew B. Davis*

Andrew B. Davis

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 5,815 words, excluding exempted text.

/s/ *Andrew B. Davis*

Andrew B. Davis

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Davis on behalf of Andrew Davis
Bar No. 24082898
andrew@lehotskykeller.com
Envelope ID: 105856701
Filing Code Description: Brief Requesting Oral Argument
Filing Description: AIRW Reply Brief
Status as of 9/19/2025 4:36 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patricia Carls | 3813425 | tcarls@tcarlslaw.com | 9/19/2025 4:28:30 PM | SENT |
| William Thompson | 24088531 | will@lkcfirm.com | 9/19/2025 4:28:30 PM | SENT |
| Edmond McCarthy | 13367200 | ed@ermlawfirm.com | 9/19/2025 4:28:30 PM | SENT |
| William Faulk | 24075674 | cfaulk@spencerfane.com | 9/19/2025 4:28:30 PM | SENT |
| John Carlton | 3817600 | john@carltonlawaustin.com | 9/19/2025 4:28:30 PM | SENT |
| Michael Parsons | 24079109 | michael@carltonlawaustin.com | 9/19/2025 4:28:30 PM | SENT |
| Carlota Hopinks-Baul | 24094039 | chbaul@spencerfane.com | 9/19/2025 4:28:30 PM | SENT |
| Helen Gilbert | 786263 | hgilbert@bartonbensonjones.com | 9/19/2025 4:28:30 PM | SENT |
| Kellie E.Billings-Ray | | Kellie.Billings-Ray@oag.texas.gov | 9/19/2025 4:28:30 PM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 9/19/2025 4:28:30 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 9/19/2025 4:28:30 PM | SENT |
| Erin  K.Snody | | Erin.Snody@oag.texas.gov | 9/19/2025 4:28:30 PM | ERROR |
| Maris Chambers | | MChambers@spencerfane.com | 9/19/2025 4:28:30 PM | SENT |
| Andrew Davis | | andrew@lkcfirm.com | 9/19/2025 4:28:30 PM | SENT |
| Todd Disher | | todd@lkcfirm.com | 9/19/2025 4:28:30 PM | SENT |
| John Carlton | | john@carltonlawfirm.com | 9/19/2025 4:28:30 PM | ERROR |
| Kelli Carlton | | kelli@carltonlawfirm.com | 9/19/2025 4:28:30 PM | ERROR |
| Erin Selvera | | erin@carltonlawfirm.com | 9/19/2025 4:28:30 PM | ERROR |
| Yahaira De Lara | | ydelara@bartonbensonjones.com | 9/19/2025 4:28:30 PM | SENT |
| Jennifer Jamison | | jennifer.jamison@tceq.texas.gov | 9/19/2025 4:28:30 PM | ERROR |
| Bobby Salehi | | bobby.salehi@tceq.texas.gov | 9/19/2025 4:28:30 PM | ERROR |
| Evan Greene | | evan.greene@oag.texas.gov | 9/19/2025 4:28:30 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Davis on behalf of Andrew Davis
Bar No. 24082898
andrew@lehotskykeller.com
Envelope ID: 105856701
Filing Code Description: Brief Requesting Oral Argument
Filing Description: AIRW Reply Brief
Status as of 9/19/2025 4:36 PM CST

Case Contacts

| Evan Greene | | evan.greene@oag.texas.gov | 9/19/2025 4:28:30 PM | SENT |
|---|---|---|---|---|
| Michael Cotton | | michael@lkcfirm.com | 9/19/2025 4:28:30 PM | ERROR |
| Skye Masson | | Skye.Masson@georgetowntexas.gov | 9/19/2025 4:28:30 PM | SENT |
| Kelsey Parker | | kparker@spencerfane.com | 9/19/2025 4:28:30 PM | SENT |